## SUMMONS - CIVIL

JD-CV-1  Rev. 2-25
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

**Instructions are on page 2.**

| For information on ADA accommodations, contact the Centralized ADA Office at 860-706-5310 or go to: www.jud.ct.gov/ADA/ |
| --- |

**STATE OF CONNECTICUT**
**JUDICIAL BRANCH**
**SUPERIOR COURT**
*www.jud.ct.gov*



☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

---

**TO: Any proper officer**

By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)*<br>**50 Field Street, Torrington, CT 06790** | Telephone number of clerk<br>**( 860 ) 626 – 2100** | Return Date *(Must be a Tuesday)*<br>**November 4, 2025** |
| --- | --- | --- |
| ☒ Judicial District  G.A.<br>☐ Housing Session  ☐ Number: ___ | At *(City/Town)*<br>**Torrington** | Case type code *(See list on page 2)*<br>Major: **M**   Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)*<br>**Ian W. Sloss, Esq., Silver Golub & Teitell LLP, One Landmark Sq., 15th Fl., Stamford, CT 066901** | Juris number *(if attorney or law firm)*<br>**058005** |
| --- | --- |
| Telephone number<br>**( 203 ) 325 – 4491** | Signature of plaintiff *(if self-represented)* |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case. Any attorney who is not exempt from e-filing is required to accept electronic delivery. (Practice Book Section 10-13)  ☒ Yes  ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book<br>**isloss@sgtlaw.com** |
| --- | --- |

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
| --- | --- | --- |
| **First plaintiff** | Name: **McBreairty, Minah**<br>Address: **288 Kent Road, New Milford, CT 06776** | **P-01** |
| **Additional plaintiff** | Name:<br>Address: | **P-02** |
| **First defendant** | Name: **Kimberly-Clark Corporation**<br>Address: **/c/o  C T CORPORATION SYSTEM, 357 East Center Street, Ste. 2 J, Manchester, CT, 06040-4471** | **D-01** |
| **Additional defendant** | Name: **New Milford Inland Wetlands and Watercourses Commission**<br>Address: **New Milford Town Clerk's Office, New Milford Town Hall, 10 Main Street, New Milford, CT  06776** | **D-02** |
| **Additional defendant** | Name: **Town of New Milford**<br>Address: **New Milford Town Clerk's Office, New Milford Town Hall, 10 Main Street, New Milford, CT  06776** | **D-03** |
| **Additional defendant** | Name:<br>Address: | **D-04** |

| Total number of plaintiffs: 1 | Total number of defendants: 3 | ☐ Form JD-CV-2 attached for additional parties |
| --- | --- | --- |

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

BRIAN WRIGHT
STATE MARSHAL
HARTFORD COUNTY

| Date<br>**10/14/25** | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court<br>☐ _____ Clerk | Name of person signing<br>**Ian W. Sloss** |
| --- | --- | --- | --- |

| If this summons is signed by a Clerk: | For Court Use Only |
| --- | --- |
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.<br>b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.<br>c. The court staff is not permitted to give any legal advice in connection with any lawsuit.<br>d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | File Date |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
| --- | --- | --- | --- |

| Print Form | Page 1 of 2 | Reset Form |
| --- | --- | --- |

RETURN DATE:    NOVEMBER 4, 2025    :    SUPERIOR COURT

                                              :

MINAH McBREAIRTY    :    JUDICIAL DISTRICT OF
                                              :    LITCHFIELD

v.    :

                                              :    AT TORRINGTON

KIMBERLY-CLARK CORPORATION,    :
NEW MILFORD INLAND WETLANDS    :
AND WATERCOURSES COMMISSION,    :
AND TOWN OF NEW MILFORD    :    OCTOBER 14, 2025

## **COMPLAINT**

1.  Plaintiff Minah McBreairty ("Plaintiff") alleges the following against Defendants Kimberly-Clark Corporation ("Kimberly-Clark"), the Town of New Milford, and the New Milford Inland Wetlands and Watercourses Commission based on personal knowledge, investigation of counsel, and information and belief.

2.  Plaintiff brings this action to stop Kimberly-Clark's ongoing pollution of Connecticut's wetlands and watercourses in violation of the Connecticut Inland Wetlands and Watercourses Act, Conn. Gen. Stat. §§ 22a-36–22a-45 (2024) (the "IWWA"), the New Milford Inland Wetlands and Watercourses Regulations, and the Connecticut Environmental Protection Act ("CEPA"), Conn. Gen. Stat. §§ 22a-14–22a-20 (2024).

3.  From 1969 through 2010, Kimberly-Clark operated an unlined landfill on a parcel of land it owns located at 281-291 Kent Road, in New Milford, Connecticut.[1]

4.  There are at least four watercourses on the Kimberly-Clark Landfill parcel as well as two delineated wetlands. By design and in function, the Kimberly-Clark Landfill directs water into wetlands and watercourses on the Kimberly-Clark Landfill property which ultimately

---

[1] For ease of reference, the parcel of land on which the landfill was operated is hereinafter referred to as the "Kimberly-Clark Landfill."

discharge directly into the Housatonic River via a culvert under Kent Road that opens directly into the Housatonic River.

5. Environmental testing has revealed that this water traveling over and through the Kimberly-Clark Landfill, its wetlands and watercourses, and into the Housatonic River and the wetlands on the banks of the Housatonic River, is contaminated with per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals"), specifically perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

6. PFOS and PFOA are two of the most hazardous members of the broader family of PFAS. PFAS are man-made chemicals, invented in the mid-20[th] century, that have traditionally been used to impart liquid repellency and wet strength on materials, including nonwovens and paper products like those manufactured by Kimberly-Clark.

7. PFAS are widely recognized by regulators and the scientific community as harmful to human health and the environment because they do not break down, and instead persist in water, soil, and wildlife and bioaccumulate in the human body. Exposure to PFAS has been associated with, *inter alia*, kidney and testicular cancers, thyroid disease, liver damage, immune system suppression, developmental harm in children, and increased cholesterol levels.

8. Thousands of PFAS chemicals have been created, but PFOS and PFOA are widely recognized by regulators, including the U.S. Environmental Protection Agency ("EPA") and the Connecticut Department of Public Health ("CT DPH"), and the scientific community as the two most dangerous and harmful types of PFAS. This is due to their persistence, tendency to bioaccumulate, and toxicity.

9. It is these very chemicals—PFOS and PFOA—with which Kimberly-Clark has polluted Connecticut's wetlands and watercourses. For example, Plaintiff tested the water

Kimberly-Clark is discharging into the Housatonic River in August of 2024 and found the following PFOS and PFOA concentrations:

**KIMBERLY-CLARK LANDFILL RUNOFF**
**TEST RESULTS: AUGUST 2024**

| PFOS | 31.2 ng/l. |
|------|------------|
| PFOA | 9.33ng/l |

10.    These PFOS and PFOA concentrations are hazardous to human health and the environment. They exceed the drinking water standards set by the EPA by several multiples and also exceed the interim guidance provided by the CT DPH, which protects the Connecticut public until the EPA's Final PFAS National Primary Drinking Water Regulation rules go into effect.

11.    The source of the PFOS and PFOA found in the water leaving Kimberly-Clark's property is Kimberly-Clark's own manufacturing waste called short-fiber paper sludge, which Kimberly-Clark generated at its New Milford, Connecticut facility located at 58 Pickett Drive.

12.    Kimberly-Clark thus polluted the wetlands and watercourses located on the Kimberly-Clark Landfill parcel, the Housatonic River, and the wetlands on the Housatonic's banks by depositing large quantities of short-fiber paper sludge into the Kimberly-Clark Landfill, where it came into direct contact with surface water and groundwater before the water was discharged into the Housatonic.

13.    The short-fiber paper sludge that Kimberly-Clark disposed of in the landfill was contaminated with PFOS, PFOA, and their chemical precursors because Kimberly-Clark used PFOS, PFOA, and their chemical precursors in Kimberly-Clark's own manufacturing processes. Specifically, Kimberly-Clark used them to impart liquid repellency and wet strength on the diaper (Huggies) and tissue (Kleenex) products.

3

14. Kimberly-Clark's ongoing pollution described herein violates both the IWWA, New Milford regulations enacted to enforce the IWWA, and CEPA.

15. The IWWA defines "pollution" broadly to mean the contamination or rendering unclean or impure of any waters of the state by reason of any waste or other materials, including but not limited to sewage, industrial waste, chemicals, or other substances, so as to be detrimental to the public health, safety, or welfare, or to legitimate beneficial uses of such water.

16. Kimberly-Clark's contamination of water in the wetlands and watercourses with PFOS and PFOA at concentrations exceeding the health-protective limits set by the EPA and the CT DPH thus qualifies as a "pollution" for purposes of the IWWA.

17. And, because Kimberly-Clark's conduct qualifies as a pollution of Connecticut wetlands and watercourses, it is a "regulated activity" subject to the IWWA.

18. Further, because Kimberly-Clark never obtained a permit authorizing the discharge of PFOS or PFOA into Connecticut's wetlands and watercourses, Kimberly-Clark's actions represent an unpermitted regulated activity in violation of the IWWA.

19. The IWWA requires that municipalities administer and enforce the Act through a duly authorized inland wetlands agency.

20. In New Milford, the New Milford Inland Wetlands and Watercourses Commission (the "New Milford IWC" or "NM IWC") is the municipal agency charged with administering and enforcing the IWWA within the town.

21. The IWWA charges the NM IWC with a non-discretionary statutory duty to administer and enforce the IWWA—including investigating credible allegations of violations and pursuing appropriate enforcement under § 22a-44—regardless of claimed staffing or resource constraints.

4

22.     On February 18, 2025, Plaintiff notified the NM IWC by letter that Kimberly-Clark was polluting Connecticut's wetlands and watercourses with dangerous levels of PFOS and PFOA, including discharging contaminated water directly into the Housatonic River in violation of the IWWA.

23.     Despite receiving Plaintiff's notice, the NM IWC refused to investigate Plaintiff's allegations of unlawful PFAS discharges, citing limited resources. This is not an adequate or lawful reason to decline to investigate violations of the IWWA.

24.     Kimberly-Clark's discharge of PFOS- and PFOA-contaminated water into Connecticut's wetlands and watercourses also violates CEPA. CEPA prohibits unreasonable pollution, impairment, or destruction of the state's natural resources, including its wetlands, watercourses, and groundwater.

25.     CEPA defines "unreasonable pollution" as any conduct that fails to justify the resulting adverse impact on the state's natural resources in light of the social, economic, and other factors set forth in Conn. Gen. Stat. § 22a-17.

26.     CEPA confers standing on any Connecticut resident or entity, including Plaintiff, to bring an action in the public interest to protect Connecticut's natural resources from unreasonable pollution, impairment, or destruction.

27.     Kimberly-Clark's discharge of PFOS- or PFOA-contaminated wastewater into Connecticut wetlands and the Housatonic River, at concentrations exceeding health-protective levels set by the EPA and the CT DPH, constitutes unreasonable pollution within the meaning of CEPA because the discharges degrade public waters, wildlife habitats, and groundwater without social or economic justification.

28.    As explained in detail herein, PFOS and PFOA are persistent, bioaccumulative toxic chemicals that contaminate surface water, sediments, and groundwater, thereby degrading wildlife habitats and public water resources, and thus amount to unreasonable pollution under CEPA.

29.    Kimberly-Clark's discharges of PFOS and PFOA into Connecticut wetlands and the Housatonic River impair the public trust in the state's natural resources by rendering those waters unsafe for human consumption, recreation, and ecological use.

30.    Because no valid social or economic justification outweighs the harm caused by these PFOS and PFOA discharges, the pollution PFOS and PFOA create is unreasonable within the meaning of CEPA.

31.    As a result of Kimberly-Clark's ongoing discharges of PFOS and PFOA, Plaintiff is entitled under CEPA to seek injunctive and remedial relief to prevent, abate, and remedy the unreasonable pollution, impairment, or destruction of Connecticut's natural resources.

32.    For the reasons outlined herein, Plaintiff seeks equitable and other appropriate relief including: (i) an injunction requiring Defendant Kimberly-Clark to cease all PFAS discharges to Connecticut wetlands and watercourses, and to implement investigation, remediation, and monitoring sufficient to abate the unreasonable pollution and restore affected resources; and (ii) orders directing the New Milford Inland Wetlands Commission and the Town of New Milford to fulfill their statutory duties under Conn. Gen. Stat. § 22a-42 and § 22a-44 to administer, investigate, and enforce the IWWA with respect to the violations alleged herein.

## PARTIES

33.    Plaintiff Minah McBreairty is a Connecticut citizen domiciled in New Milford, Connecticut. Plaintiff has occupied the land parcel located at 288 Kent Road since 2002.[2]

34.    By virtue of occupying 288 Kent Road, for the reasons outlined herein, Plaintiff is classically aggrieved under the IWWA because her use and enjoyment of her land is uniquely and adversely affected by Kimberly-Clark's discharge of PFOS and PFOA into the adjacent wetlands and watercourses. Plaintiff is also statutorily aggrieved under the IWWA, as an occupant of land adjacent to a regulated area affected by the challenged activity.

35.    By virtue of Plaintiff's Connecticut residency she has statutory standing under CEPA to bring this action in the public interest to protect Connecticut's natural resources from unreasonable pollution, impairment, or destruction. Conn. Gen. Stat. § 22a-16.

36.    Defendant Kimberly-Clark Corporation is a Delaware corporation based in Texas that maintains its principal place of business at 351 Phelps Dr, Irving, TX 75038-6507. At all times mentioned herein, Defendant Kimberly-Clark improperly used, stored, emitted, discharged, disposed of, and/or distributed PFAS Chemicals in and around New Milford, Connecticut.

37.    Defendant Town of New Milford was, at all relevant times, and is a municipal corporation duly organized under the laws of the State of Connecticut.

38.    The New Milford Inland Wetlands and Watercourses Commission was, at all relevant times, and is the commission authorized pursuant to Connecticut state law by the Defendant Town of New Milford under Conn. Gen. Stat. § 22a-42 to carry out the provisions of the IWWA.

---

[2] For ease of reference, the parcel located at 288 Kent Road, New Milford, Connecticut, is hereafter referred to in this Complaint as "288 Kent Road."

7

## FACTUAL BACKGROUND

### I.    288 KENT ROAD

39.     Plaintiff occupies 288 Kent Road, a parcel of land which lies directly across Kent Road from the Kimberly-Clark Landfill. The eastern portion of the Kimberly-Clark Landfill fronts the western side of Kent Road, and 288 Kent Road sits on the opposite, eastern side, positioned between Kent Road and the Housatonic River.

40.     288 Kent Road also sits along the Housatonic River, a body of water that is 149 miles long and spans almost 2,000 square miles from its source in the Berkshires, through Connecticut, to Long Island Sound. Specifically, the Housatonic River abuts and runs over the eastern portion of 288 Kent Road, forming the eastern property line and abutting 288 Kent Road's backyard, as illustrated in Figure 1, below, with the location of 288 Kent Road highlighted in yellow. Said differently, the eastern boundary of 288 Kent Road is the Housatonic River itself.

### FIGURE 1



8

41.    288 Kent Road is directly downgradient of the Kimberly-Clark Landfill, such that it stands between the landfill site and the Housatonic River into which contaminated surface water and groundwater ultimately discharge. The location of 288 Kent Road relative to the Kimberly-Clark Landfill can be seen in Figure 2, below, with 288 Kent Road's location highlighted by the red circle and labeled.

**FIGURE 2**



42.    The drinking water well at 288 Kent Road from which Plaintiff draws her drinking water well has been designated as a monitoring well by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") for the Kimberly-Clark Landfill due to its susceptibility to leachate from the Kimberly-Clark Landfill. That is, the CT DEEP has determined that given the hydrogeology of the parcels, including the direction of underground water flower, chemicals found in the waste in the landfill are likely to migrate into the drinking water well serving 288 Kent Road.

9

The 288 Kent Road monitoring well is designated as "Monitoring Well B," and is highlighted in yellow in Figure 1, above.

43. In April 2024, testing of the drinking water drawn from the well at 288 Kent Road confirmed contamination with PFAS—and specifically PFOS and PFOA—at concentrations exceeding the maximum levels deemed safe for human consumption under current standards set by the EPA and by the prevailing scientific consensus regarding the health risks of PFOS and PFOA, as reflected below:

**RESULTS OF APRIL 2024 TESTING OF**
**288 KENT ROAD DRINKING WATER WELL**

| | |
|---|---|
| PFOS | 8.74 ng/l. |
| PFOA | 4.83 ng/l |

44. The above April 2024 results make it clear that the drinking water at 288 Kent Road is no longer safe for human consumption, having been directly compromised by the toxic legacy of Kimberly-Clark's waste disposal practices.

45. In addition to the contamination of the drinking water well, the eastern portion of 288 Kent Road has itself been polluted because the property directly borders the Housatonic River into which Kimberly-Clark has for decades discharged PFAS-laden discharge water.

46. The leachate has contaminated the Housatonic River with PFAS, as confirmed by testing by the CT DPH which showed that fish in the Housatonic River contain PFAS, including PFOS, at levels that triggered fish consumption advisories restricting or prohibiting the eating of species such as carp and bass. These results show that PFAS from the river are bioaccumulating in aquatic life and persisting in the ecosystem. The same PFAS-laden river water has deposited into

10

the soils along the river's banks, including on the eastern edge of 288 Kent Road, where delineated wetlands now contain PFAS contamination.

## II.    THE KIMBERLY-CLARK LANDFILL

47.    Kimberly-Clark owns the Kimberly-Clark Landfill, a 165-acre landfill site located at 281-291 Kent Road in New Milford, Connecticut.

48.    As discussed below, Kimberly-Clark dumped PFAS-contaminated waste at the Kimberly-Clark Landfill for decades. Because the landfill is unlined, water has leached through the dumped waste, becoming contaminated with PFAS, and migrated into the surrounding area's drinking water wells.

49.    Also, because Kimberly-Clark designed the landfill to dump waste into the Housatonic River via a drainage culvert, PFAS-contaminated wastewater is flowing into the Housatonic River on a continuous basis.

50.    The Kimberly-Clark Landfill is located approximately 3.5 miles up the road from a 60-acre parcel located at 58 Pickett District Road, New Milford, Connecticut which Kimberly-Clark has owned since the 1960s (the "New Milford Facility").

51.    The New Milford Facility has and continues to be critical to Kimberly-Clark, serving as Kimberly-Clark's New York City metro area production and distribution hub for Kimberly-Clark's key Huggies and Kleenex lines.

52.    This was particularly true in the 1970's when Kimberly-Clark launched its Huggies brand of diapers. Kimberly-Clark launched Huggies in December 1977 and rolled it out nationally by 1978 and the new brand quickly found traction, becoming Kimberly-Clark's growth engine through the 1980s. As outlined in *Kotex, Kleenex, Huggies: Kimberly-Clark and the Consumer*

11

*Revolution in American Business*, complex machinery was needed and New Milford served as one of three core production mills making Huggies at launch:

> Engineers, working closely with scientists in the product development team, devised a wide array of proprietary machine designs *for the core mills in Memphis, Tennessee; Beech Island, South Carolina; and New Milford, Connecticut*. A tissue machine combined layers of absorbent padding into sheets of varying thickness to form the wings and the crotch section, which was 15 percent thicker than the edges. Once the sheet had been cut into individual hourglass shapes, the latter received an elastic band at the crotch section and were combined with the cover and backing sheet to form the diaper.[3]

53.     Kimberly-Clark continued manufacturing Huggies in New Milford from the late 1970s through 2004, when the New Milford Facility stopped making Huggies to focus exclusively on Kleenex tissue paper products, which continues today.

54.     According to publicly filed records with the CT DEEP, Kimberly-Clark used the Kimberly-Clark Landfill to dispose of "short fiber paper sludge"—a byproduct of its diaper and tissue manufacturing processes undertaken at the New Milford Facility that involved the direct application of PFAS products purchased from 3M, DuPont, and potentially others.

55.     Kimberly-Clark purchased the Kimberly-Clark Landfill parcel in 1969 and operated an active short fiber paper sludge disposal operation at the site from 1969 to 2010. The Kimberly-Clark Landfill is located in a rural area dominated by unimproved land and residences. There are not now nor ever have there been any other industrial facilities at or in the proximity to the Kimberly-Clark Landfill.

56.     The western edge of the Kimberly-Clark Landfill abuts a high, pristine, undeveloped ridge which forms the whole western boundary of the site. The northern boundary abuts residential parcels, and the southern boundary abuts unimproved land. The eastern boundary

---

[3] Unless otherwise noted, all emphasis herein are added.

of the property abuts Kent Road, with the Housatonic River located a short distance to the east of Kent Roard, as illustrated in Figure 3 below:

**FIGURE 3**



57.     As depicted in Figure 4 below, the Kimberly-Clark Landfill contains extensive wetlands and watercourses, with at least four watercourses and two wetlands on the Kimberly-Clark Landfill parcel, as depicted by the black triangles on the map, which was prepared by Kimberly-Clark's environmental consultant.

**FIGURE 4**



58.     CT DEEP issued a permit to Kimberly-Clark for operation of the landfill on November 14, 1983, and a modified permit on February 9, 1984 (the "Landfill Permits"). The Landfill Permits permitted Kimberly-Clark to dispose of short fiber paper sludge originating from the New Milford Facility only. Meaning that all contents of the Kimberly-Clark Landfill came from Kimberly-Clark's New Milford Facility.

59.     CT DEEP has never issued, nor has Kimberly-Clark ever obtained, a permit allowing the discharge of PFAS from the Kimberly-Clark Landfill into the Housatonic River or the surrounding area's water table.

60.     Kimberly-Clark ceased dumping paper sludge at the Kimberly-Clark Landfill in 2010, and it was thereafter capped with 24 inches of fill which included the short fiber paper sludge and closed in 2017.

61.     The Landfill Permits required Kimberly-Clark to maintain water quality monitoring wells on the property to track and observe water quality in those wells and in the wells of

14

neighboring residences for any contamination caused by the contents of the Kimberly-Clark Landfill.

62. The Landfill Permits also required Kimberly-Clark to monitor the water quality in the wells of five private residences located between Kent Road and the Housatonic River to the east of the Kimberly-Clark Landfill, as well as two surface diversion streams on the property, referred to as the North and South Streams. One of the designated monitoring wells identified in the permits is Monitoring Well B, which is the drinking water well located on 288 Kent Road.

63. Kimberly-Clark's monitoring of the landfills' impact on the water table included several chemicals, but not PFOS, PFOA, or other PFAS. This monitoring, however as confirmed by filings with the State of Connecticut, established that the surrounding residences' wells were sensitive to leachate from the Kimberly-Clark Landfill. That is, the chemicals Kimberly-Clark detected in the private residential monitoring wells—including the 288 Kent Road Monitoring— match the chemicals present in Kimberly-Clark's short fiber paper sludge dumped at the Kimberly-Clark Landfill. There is no reason PFOS and PFOA has migrated differently.

64. Documents filed by Kimberly-Clark demonstrate the parcel on which the Kimberly-Clark Landfill sits is underpinned with bedrock which is approximately 15-90 feet below the surface. The soil in the layer over the bedrock is moderately transmissive, and critically, the landfill is not lined, which increases the ability of PFAS in the landfill to impact the surrounding soil and groundwater.

65. The hydrology of the Kimberly-Clark Landfill was designed by Kimberly-Clark and dictates that groundwater moves from west to east—from the Kimberly-Clark Landfill to the Housatonic River. Kimberly-Clark specifically designed the Kimberly-Clark Landfill so that surface water collects in two diversion streams which connect into one stream in the northeastern

15

part of the Kimberly-Clark Landfill, which then dumps into the Housatonic River in the area of the Boardman Bridge. This waterflow is illustrated in Figure 5, below, with arrows indicating the direction of water and the runoff streams highlighted for ease of reference:

**FIGURE 5**



66.    PFAS emanating from the Kimberly-Clark Landfill not only directly impact the land and water supplies nearest to the landfill property but also travel distances further away once they enter groundwater or surface water.

16

III.    **CONNECTICUT'S ENVIRONMENTAL PROTECTION ACT**

67.    In 1971, the Connecticut General Assembly enacted CEPA, Conn. Gen. Stat. §§ 22a-14–20, to safeguard the State's natural resources from unreasonable pollution, impairment, and destruction.

68.    CEPA declares it to be the policy of Connecticut that the air, water, and other natural resources of the State are held in trust for the public, and that each person is entitled to their protection, preservation, and enhancement. Conn. Gen. Stat. § 22a-15.

69.    CEPA provides that "no person shall unreasonably pollute, impair or destroy the public trust in the air, water or other natural resources of the state." Conn. Gen. Stat. § 22a-16.

70.    In determining whether conduct constitutes "unreasonable pollution" under CEPA, courts balance the environmental harm against any claimed social or economic benefit, with the burden on the party causing the pollution to demonstrate that its conduct is justified.

71.    CEPA empowers individuals, as well as the State, to act as private attorneys general by bringing suit in Superior Court to protect natural resources from unreasonable pollution, impairment, or destruction. Conn. Gen. Stat. § 22a-16. Any person may institute an action for declaratory or equitable relief to enjoin conduct that threatens the public trust in Connecticut's air, water, or other natural resources, without needing to show a personal or property interest distinct from the public at large.

IV.    **CONNECTICUT'S INLAND WETLANDS AND WATERCOURSES ACT AND THE NEW MILFORD REGULATIONS**

72.    In 1972, the year following enactment of CEPA, the Connecticut General Assembly enacted the IWWA, Conn. Gen. Stat. §§ 22a-36–45, to provide further protection for Connecticut's inland wetlands and watercourses.

17

73.    The IWWA declares it to be the public policy of Connecticut to prevent the despoliation and destruction of inland wetlands and watercourses, recognizing that these natural resources are essential to the health, welfare, and safety of Connecticut's residents.

74.    To effectuate its goal, the IWWA prohibits any person from conducting a "regulated activity" within or affecting wetlands or watercourses without first obtaining a permit from the local inland wetlands agency. A "regulated activity" includes any operation within or use of a wetland, watercourse, or adjacent upland area involving removal or deposition of material, obstruction, alteration, or pollution of such resources, or any other conduct likely to impair the functions or quality of wetlands or watercourses.

75.    The IWWA defines "pollution" broadly to include any harmful alteration of the physical, chemical, or biological properties of wetlands or watercourses, as well as the placement of any material that is likely to degrade water quality or impair wetlands functions.

76.    The IWWA requires every Connecticut municipality to establish and enforce its own inland wetlands and watercourses regulations consistent with the Act and gives municipal inland wetlands agencies the authority to regulate activities affecting wetlands and watercourses within their jurisdiction.

77.    Acting under authority of the IWWA, Conn. Gen. Stat. §§ 22a-36–22a-45, the Town of New Milford created its Inland Wetlands Commission by ordinance on March 17, 1988. *See* New Milford Code § 2-113 (Ord. of Mar. 17, 1988).

78.    On October 13, 1988, New Milford adopted its Inland Wetlands and Watercourses Regulations, which have since been amended on several occasions. *See* New Milford Inland Wetlands and Watercourses Regs. § 1.3.

79.    The New Milford Inland Wetlands and Watercourses Regulations charge the NM IWC with administering and enforcing the IWWA locally, including authority to issue or deny permits, condition approvals, and enforce violations. *See* New Milford Code § 2-114; New Milford Inland Wetlands and Watercourses Regs. §§ 1.5, 20.1.

80.    Under the New Milford Inland Wetlands and Watercourses Regulations, no person may conduct a regulated activity—which includes pollution—within or affecting wetlands or watercourses in New Milford without first obtaining a permit from the Commission. *See* New Milford Inland Wetlands and Watercourses Regs. §§ 2.1, 4.1.

81.    Similar to the IWWA, a "regulated activity" under the New Milford Inland Wetlands and Watercourses Regulations includes any operation within or use of a wetland, watercourse or upland review area involving removal or deposition of material, or any obstruction, construction, alteration or pollution of such wetlands, watercourses or upland review area or any operation or use of land that may disturb the natural and indigenous character of a wetland, watercourse or upland review area. *See* New Milford Inland Wetlands and Watercourses Regs. § 2.29.

82.    The New Milford Inland Wetlands and Watercourses Regulations define "pollution" broadly to include "harmful thermal effect or the contamination or rendering unclean or impure of any waters of the state by reason of any waste or other materials discharged or deposited therein by any public or private sewer or otherwise so as directly or indirectly to come in contact with any waters. This includes, but is not limited to, erosion and sedimentation resulting from any filling, land clearing or excavation activity. *See* New Milford Inland Wetlands and Watercourses Regs. § 2.27.

19

## V.   THE ORIGINS AND DANGERS OF PFAS, INCLUDING PFOS AND PFOA

83.   Per- and polyfluoroalkyl substances (PFAS, as defined above) are a group of synthetic chemicals containing fluorine and carbon.

84.   The two most widely studied types of PFAS are PFOA and PFOS, both man-made, fully fluorinated organic acids with eight carbon atoms.

85.   PFOS and PFOA were the earliest commercialized forms of PFAS, each engineered to deliver unique surfactant and repellency properties. Both compounds were invented and, for decades, exclusively manufactured by 3M, with DuPont later also serving as the exclusive manufacturer of PFOA for a period of time. Their dominance in the market ensured that nearly all early industrial and consumer uses of PFAS were derived from these two chemicals.

86.   PFAS, including PFOS and PFOA, have long been incorporated into commercial products to impart water repellency, such as in disposable diapers, and to enhance wet strength in other paper goods, including tissues.

87.   3M conducted extensive toxicity studies on PFAS, including PFOS and PFOA, as early as the 1950s, concluding that the chemicals were toxic.

88.   Further toxicity studies conducted by 3M scientists in the late 1970s confirmed that the chemicals were even "more toxic than anticipated."

89.   In 1978, 3M conducted studies on monkeys and rats, feeding them various dosages of PFOS and PFOA. All monkeys in the study died within the first few days after being given PFOS at a dosage of 4.5 mg/kg/day. Monkeys being given 100 mg/kg/day of PFOA "all died during weeks 2 and 5 of the study." 3M's studies showed that both PFOA and PFOS affected the liver and gastrointestinal tract of the animals being tested.

90.    3M concluded that PFOS was "the most toxic" of the compounds studied and "certainly more toxic than anticipated."

91.    3M consulted with Harold Hodge, a well-known toxicologist, who emphasized that it was of "utmost importance" to determine whether these chemicals "or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

92.    Further, in 1975, 3M was alerted by third-party researchers that PFOS was detectable in human blood serum and thus had obviously spread beyond the immediate site of its applications and was bioaccumulating. 3M's own research confirmed by the next year that the level of fluorochemicals in the blood of its own workers was "1,000 times normal."

93.    Conducting research around its manufacturing plants, 3M knew by 1979 that its fluorochemicals "bioaccumulated more readily in the gastrointestinal tract, fat and reproductive system [at least in] channel catfish[.]"

94.    By 1979, 3M recognized that fluorochemicals may pose a cancer risk. Indeed, one of its scientists pressed that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

95.    3M also knew the environmental implications associated with PFAS compounds, including PFOS and PFOA, but refused to allow testing to perform precise ecological risk assessments. One of its longtime scientists, Dr. Richard Purdy, stated in an internal email in early 1999 or late 1998: "PFOS is the most onerous pollutant since pcb and you want to avoid collecting data that indicates that it is probably worse. I am outrage[d.]"

96.    Despite 3M's knowledge of PFAS toxicity and potential carcinogenicity, the mobility and persistence in the environment of such chemicals, and their tendency to

bioaccumulate and biomagnify, the Company continued to manufacture, sell, and distribute PFAS-based products until at least 2000.

97.    In March 1999, Dr. Purdy resigned in response to 3M's refusal to research PFAS's environmental effects and its failure to address the chemicals' known environmental harms. Dr. Purdy's resignation letter stated:

> 3M waited too long to tell customers about the widespread dispersal of PFOS in people and the environment. We knew before May of 1998, yet 3M did not start telling customers until January of 1999. I felt guilty about this and told customers I personally knew earlier. Still, it was not as early as it should have been. I kept waiting for 3M to do its duty, as I was continually assured that it would. Some of the customers have done risk assessments on the PFOS precursor they use. They assume there is not a background in the environment and in wildlife. Since there is a background, their risk assessments are inaccurate. Thus they can make inappropriate business decisions and not realize that their use of PFOS precursors contributes to an aggregate risk.
>
> 3M continues to make and sell these chemicals, though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that perfluorooctansulfonate [PFOS] is biomagnifying in the food chain and harming sea mammals. This chemical is more stable than many rocks. And the chemicals the company is considering for replacement are just as stable and biologically available. The risk assessment I performed was simple, and not worst case. If worst case is used, the probability of harm exceeds 100,000%. 162. Dr. Purdy's letter concluded by stating that he could no longer work for a company "concerned with markets, legal defensibility and image over environmental safety."

98.    As Purdy alludes to, in early 1999, 3M began explicitly notifying major customers that fluorochemicals such as PFOS and its precursors (PFOS and its precursors were used to manufacture products such as FC-808 and FX-1801 and were purchased and used by Kimberly-Clark) could have adverse impacts on human health. As just one example, 3M notified major customer Wolverine Worldwide, Inc. in January 1999 of these risks at an in person meeting and followed up with a letter to Wolverine Worldwide Executive Vice President Rick DeBlasio memorializing key points on January 15, 1999 (the "Wolverine Letter").

22

99.     Shortly after Purdy's resignation from 3M and disclosures to the EPA, 3M supplemented its prior submissions to the EPA with critical information referenced by Dr. Purdy, resulting in 3M's announcement in 2000 that "[f]ollowing negotiations between EPA and 3M, the company today announced that it will voluntarily phase out and find substitutes for perfluorooctanyl sulfonate (PFOS)[.]" 3M's stated reason for the phase out of PFOS was that "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." A public press release from 3M memorializing these developments was published on May 16, 2000.

## VI.     THE IMPACT OF PFAS ON THE ENVIRONMENT AND PUBLIC HEALTH

100.    PFAS cause extensive and long-lasting environmental contamination.

101.    PFAS persist in the environment indefinitely because of their strong carbon-fluorine bonds, which are resistant to metabolic and environmental degradation processes.

102.    Once introduced into the environment, PFAS migrate and contaminate natural resources, including ground and surface waters, from which they are difficult and costly to remove.

103.    Studies show that both terrestrial and aquatic plants absorb PFAS from contaminated soil and water, accumulating these compounds in their tissues.

104.    Studies show that PFAS exposure, even at relatively low levels, induces oxidative stress in plants and affects multiple plant functions and processes, including photosynthesis and energy metabolism.

105.    As early as the 1950s, substantial resources were devoted to testing the toxicity of PFAS on various animal species, revealing incredibly dangerous impacts upon an array of mammals, birds, and fish.

23

106. A growing list of peer-reviewed publications indicate that the adverse effects associated with PFAS exposure in wildlife align with findings from human epidemiological studies.

107. PFAS, including PFOS and PFOA, pose significant risks to animal health and animal ecosystems, including aquatic ecosystems.

108. PFAS, including PFOS and PFOA, bioaccumulate and biopersist in animals and are toxic to their health. They also biomagnify, meaning their concentration in organic tissue increases as they are consumed up the food chain.

109. Studies show that PFAS, including PFOS and PFOA, can negatively affect the survival, growth, and reproduction of fish, amphibians, and aquatic insects.

110. PFAS easily cycle through the environment via air, water, soil, and sediments, with primary sources of contamination stemming from manufacturing sites.

111. PFAS are water soluble: Once PFAS enter a body of water, they easily spread throughout the body of water or water system and remain unless and until the PFAS are actively removed. As a result, drinking water contamination is a common way people are exposed to PFAS.

112. PFAS spread via surface water and groundwater. PFAS can leach into soil and, from there, enter groundwater systems. Once PFAS have contaminated groundwater, they can spread through aquifers, which are layers of water-bearing permeable rock, sand, or gravel from which groundwater can be extracted.

113. Typical water treatment and filtration systems do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties.

114. Likewise, chlorine and other disinfectants that are often added to drinking water systems are not capable of removing, and do not remove, PFOS or PFOA.

24

115.    Removal of PFAS from drinking water requires specialized and expensive treatment systems. Additionally, the disposal of PFAS, once extracted from drinking water must be done safely, which is costly and introduces new risks.

## VII.    FEDERAL GOVERNMENT PFAS RESEARCH AND REGULATION

116.    Given their physical and chemical properties, PFAS Chemicals have become incredibly widespread in the environment, contaminating drinking water supplies and water infrastructure (including stormwater systems, water treatment plants, drinking water delivery infrastructure, and wastewater systems and biosolids).

117.    According to the EPA, between 1999 and 2012, PFOA and PFOS have been detected in the blood serum of 99 percent of the U.S. population. In October of 2017, the Director of the U.S. Center for Disease Control's National Center for Environmental Health, Patrick Breysse, described the chemicals as "one of the most seminal public health challenges for the next decades" and estimated that 10 million Americans were drinking contaminated water. Current research estimates that this number may be significantly higher.

118.    The EPA began to investigate the safety of PFOA and PFOS in or around 1998 following some limited disclosures by 3M and others and began to issue health advisories for these chemicals on January 8, 2009.

119.    The 2009 EPA health advisory noted merely that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively.

120.    In May 2016, the EPA significantly revised its PFOA and PFOS lifetime health advisory, recommending that drinking water concentrations for PFOA and PFOS, either alone or combined, should not exceed 70 ppt.

25

121. In January 2023, the EPA released its Clean Water Act Effluent Limitations Guidelines Plan 15, setting forth plans to develop technology-based standards for certain industries that discharge PFAS. This Plan announced rulemaking proceedings to address PFAS discharges from landfills, and a new Publicly Owned Treatment Works ("POTW") Influent Study. This study will collect more data on POTW influent from a broad range of industries that could result in revised Effluent Limitations Guidelines ("ELGs") in the future.

122. On February 22, 2021, the EPA finalized its decision to regulate levels of PFOS and PFOA in drinking water under the Safe Drinking Water Act, including by proposing enforceable Maximum Contaminant Levels ("MCLs").

123. On June 15, 2022, the EPA announced drastically reduced health advisories for PFOA and PFOS, reducing the tolerance for these contaminants from 70 ppt to 0.004 ppt and 0.020 ppt, respectively.

124. In May, 2025, the EPA re-affirmed the 4ppt drinking water standards for PFOA and PFOS in its Final PFAS National Primary Drinking Water Regulation, which will go into effect in 2031.

## VIII. STATE OF CONNECTICUT PFAS REGULATIONS

125. The State of Connecticut has taken a comprehensive and proactive approach to address the dangers PFAS, reflecting the state's view that PFAS pose serious risks to human health and the environment. Both the Connecticut legislature and state agencies have explicitly acknowledged that PFAS are linked to severe health hazards.

126. In July 2019—amid growing scientific and public alarm about PFAS—Governor Ned Lamont established the Connecticut Interagency PFAS Task Force ("Task Force") to develop a statewide strategy for addressing PFAS. The Task Force was charged with developing

26

recommendations to "minimize environmental exposures" to PFAS, identify and clean up historical PFAS pollution, and prevent future releases of these chemicals.

127.    On November 1, 2019, the Task Force issued a comprehensive PFAS Action Plan outlining Connecticut's strategy. The Action Plan called for a wide range of measures—from expanded testing of water supplies and fish, to establishing PFAS cleanup standards, to pursuing legislation limiting PFAS in firefighting foam and consumer products.

128.    In 2019, the CT DPH set a conservative Drinking Water Action Level of 70 parts per trillion (ppt) for the total concentration of several key PFAS Chemicals in drinking water.

129.    Recognizing the need to provide immediate protection to Connecticut residents while federal regulations were still pending, the CT DPH acted in tandem with the EPA's announcement of updated guidance on June 15, 2022. On that same day, the CT DPH issued sharply reduced interim Action Levels for PFAS in drinking water—lowering the thresholds to 10 ppt for PFOS, 16 ppt for PFOA, and similarly stringent single-digit levels for several other PFAS compounds—replacing its prior 70 ppt combined limit.

130.    Although Connecticut's Action Levels currently serve as interim guidance, they will give way once the EPA's enforceable standards take effect. At that point, the CT DPH will be obligated to align its limits with federal law, lowering the maximum allowable concentrations of PFOS and PFOA in drinking water to 4 parts per trillion.

131.    Connecticut's legislature has also made strong pronouncements about the dangers of PFAS through the passage of strict laws. In 2021, Connecticut became one of the first states to ban PFAS in firefighting foam and food packaging, two major sources of PFAS contamination. On July 13, 2021, Governor Lamont signed Public Act 21-191, *An Act Concerning the Use of PFAS*

*in Class B Firefighting Foam*, which the Governor hailed as a "strict law[]" needed because PFAS "can easily get into our water streams and can cause significant harm to drinking water."

132. Public Act 21-191 also targeted consumer products by banning PFAS in food packaging, directing that as of December 31, 2023, no food package or food-contact material sold in Connecticut may contain intentionally added PFAS.

133. In May 2024, the Connecticut General Assembly enacted Public Act 24-59, *An Act Concerning the Use of PFAS in Certain Products*, a sweeping law to phase out and ban PFAS in a broad array of consumer, environmental, and safety products. *See* Conn. Pub. Act No. 24-59, An Act Concerning the Use of PFAS in Certain Products (2024).

134. Public Act 24-59 immediately outlawed certain high-risk PFAS uses: for example, as of October 1, 2024, it became illegal in Connecticut to use or sell PFAS-containing biosolids (sewage sludge) as fertilizer, cutting off a concerning pathway by which PFAS from wastewater could enter soil, crops, and groundwater.

135. Public Act 24-59 also implements a phased approach to remove PFAS from everyday consumer products. For example, beginning January 1, 2026, manufacturers and sellers of various textiles and apparel (such as heavy-duty wet-weather gear) that contain intentionally added PFAS must clearly label these products as "Made with PFAS chemicals." Additionally, they are required to inform consumers of the purpose of the PFAS additives used in these products.

136. Similar PFAS content labeling requirements take effect by July 1, 2026 for a wide range of other consumer items—including rugs and carpets, cookware, cosmetics, dental floss, children's products, and feminine hygiene products—if those items were produced with intentionally added PFAS.

28

137.    Most critically, after January 1, 2028, the manufacture, sale, or distribution in Connecticut of all these regulated product categories will be completely prohibited if they contain intentionally added PFAS.

138.    In other words, recognizing the public health and environmental dangers PFAS pose, Connecticut has legislated a near-total ban on PFAS-containing products (with only narrow exceptions for unavoidable trace contamination) set to take place over the next twelve months.

## SUBSTANTIVE ALLEGATIONS

### I.    KIMBERLY-CLARK USED PFAS IN ITS PRODUCTS FOR DECADES

139.    Kimberly-Clark has a multi-decade history of use of PFAS, and specifically PFOS and PFOA, primarily for fluid and stain repellency and wet-strength in its nonwoven and paper products, including diapers and tissues. As outlined below, evidence from Kimberly-Clark's own patent portfolio and recent testing of Kimberly-Clark vintage Huggies and Kleenex products establishes a direct reliance on and collaboration with the primary PFAS manufacturers—3M and DuPont—and the presence of PFAS in Kimberly-Clark's consumer products.

140.    Numerous Kimberly-Clark patents dating as far back as the 1970's explicitly name, describe, and call for the use of specific, 3M- and DuPont-branded commercial products such as 3M's FC-807, FC-808, FX-1801, and DuPont's "Zonyl" and "Capstone" fluoropolymers to manufacture disposable diapers, other nonwoven products, and facial issues.

141.    The materials for Kimberly-Clark's Huggies and Kleenex products were manufactured by a plant in LaGrange, Georgia, which, consistent with the patented processes discussed herein, applied PFOS- and PFOA-containing chemicals to the materials. These PFOS- and PFOA-containing materials were then sent to Kimberly-Clark's New Milford Facility, where they were cut and assembled into diaper and tissue products.

29

## II.    KIMBERLY-CLARK'S FOUR DECADES OF PATENT FILINGS INCORPORATE PFAS

142.    The foundation for Kimberly-Clark's decades-long pattern of dependence on 3M and DuPont's PFAS for manufacturing nonwovens was laid in 1977 when Kimberly-Clark obtained U.S. Patent No. 4,041,203 for a *Nonwoven Thermoplastic Fabric* invented by Kimberly-Clark employee Robert J. Brock.

143.    This patented "cloth-like" sheet served as the foundation for Kimberly-Clark's Huggies line, giving the diapers a soft feel coupled with fluid repellency to prevent leaks. Patent No. 4,041,203 describes nonwoven sheets made by joining two plastic fiber layers: a layer of very fine fibers (made by melt blowing) and a layer of stronger strands (made by spinning), then bonding them at tiny points. This structure lets air pass for comfort but slows liquid from pushing through, making it useful as a breathable but leak resistant barrier for diapers.

144.    Important here, in Patent No. 4,041,203's Example XIII (shown below), Kimberly-Clark describes running the laminate through a bath with 3M's FC-808 fluid repellent (described as a high-molecular-weight cationic fluorocarbon), then dries it to impart liquid resistance. The finished fabric contains about 0.2% FC-808 and shows improved water and alcohol repellency. In short, 3M's FC-808 is the ingredient Kimberly-Clark relied on to impart hydrophobic properties onto nonwoven sheets made pursuant to this method and shows Kimberly-Clark sourcing and using a named 3M fluorocarbon in the process.

**EXAMPLE XIII**

A laminate was prepared generally in accordance with the Example I procedure containing about 0.6 oz./yd.$^2$ of microfiber mat and about 0.8 oz./yd.$^2$ of continuous filament web. An antistatic composition was then applied to the laminate by passing it (at 175 fpm) through a bath containing the following ingredients in parts by weight.

| | |
|---|---|
| Water | 789 |
| "ZELEC" DP antistat (DuPont-quaternary ammonium salt aqueous emulsion) | 1 |
| FC-808 fluid repellent (3M Company --high molecular weight cationic fluorocarbon aqueous emulsion) | 8 |
| Medical Antifoam C (Dow) | .8 |
| Synthrapol KB (ICI) wetting agent | 1.9 |

The material was then dried by passage over hot cans. The resulting material contained, by weight, 0.1% of "ZELEC" DP and 0.2% of FC-808. The presence of the antistatic composition reduced the surface resistivity of the laminate of about $10^{13}$ ohms/square to about $10^9$ ohms/square. The reduced level of resistivity was retained after subsequent sterilization (both steam and ethylene oxide) which was readily effected in conventional fashion. The sterilized material had desirable characteristics of water and alcohol repellency and, in addition, exhibited particularly advantageous bacterial barrier properties.

145.    As outlined in the 2004 internal 3M email, FC-808 is a known PFOS-based product made using the known PFOS precursor N-methylperfluorooctane sulfonamidethylacrylate ("MeFOSEA"):[4]

---

[4] As discussed in Plaintiff's diaper test results, the Huggies diapers Plaintiff had tested came back with high concentrations of several  N-methylperfluorooctane sulfonamidethylacrylate (MeFOSEA), a PFOS precusor which, when disposed of in the landfill and oxidized, turns into PFOS.

31



Michael J.
Falco/US-Corporate/3M/US
10/12/2004 10:38 AM

To  Larry A. Wendling/US-Corporate/3M/US@3M-Corporate

John R. Allison/LA-Legal/3M/US@3M-Corporate, Dale L.
Bacon/US-Corporate/3M/US@3M-Corporate, Thomas J.
DiPasquale/US-Corporate/3M/US@3M-Corporate, Dan E.
Gahlon/US-Corporate/3M/US@3M-Corporate, George H.
Millet/DY-Dyneon/3M/US@3M-Corporate, Katherine E.
cc  Reed/US-Corporate/3M/US@3M-Corporate, Richard H.
Renner/US-Corporate/3M/US@3M-Corporate, Michael A.
Santoro/US-Corporate/3M/US@3M-Corporate, Larry R.
Zobel/US-Corporate/3M/US@3M-Corporate, William M.
Nelson/US-Corporate/3M/US@3M-Corporate

bcc

Subject  FC-808 Production

Larry- this is an answer to your question on FC-808 (a PFOS-based polymer used in the production of ordnance). The production of this material is done under a TSCA SNUN at Decatur. The intermediate used to make this polymer (MeFOSEA) was originally made at Antwerp and is now stockpiled at Decatur. As we do not have authorization to make or import MeFOSEA, the manufacture of the FC-808 polymer will continue at Decatur until we run out of MeFOSEA or 4Q 2007, whichever comes first. The polymerization of FC-808 generates little waste or emissions. This is the only PFOS / PFOA- related activity that will continue at Decatur after the end of this year.

Mike
Michael J Falco
3M
SMD, EHS&R Manager
3M Center, Building 236-1B-10
St. Paul, MN 55144-1000
+1.651.736.2908 (direct line)
+1.651.733.1958 (FAX)
+1.651.308.5836 (GSM), E-mail: mjfalco1@mmm.com
Assistant: Lora Arndt, +1.651.733.1976

146.    In the 1980s, 1990s, and 2000s, Kimberly-Clark obtained follow-on patents that applied this same spunmelt platform to diaper and feminine product uses and continued to specify fluorinated chemicals manufactured by 3M and DuPont as additives to give the meltblown and spunbond layers fluid repellency. These patents also show that Kimberly-Clark eventually switched from using FC-808 to using another fluorinated 3M product known to contain PFOS and its precursors named FX-1801 in the 1990's.

147.    For example, in 1986, Kimberly-Clark obtained U.S. Patent No. US-4578069-A for a Breathable Baffle Composite. The "baffle" is the outermost backsheet layer of the diaper—the part that faces clothing and skin. Its function is to stop liquid from leaking out while still allowing moisture vapor and air to pass through, making the product more comfortable and reducing skin irritation. Patent No. US4578069A improves on the older, purely plastic backsheets that trapped heat and moisture and made noise with a more cloth-like feel. The breathable version helped make Huggies and other Kimberly-Clark diapers feel more like fabric clothing. Importantly, in Patent

No. US4578069, Kimberly-Clark expresses a continued strong preference for 3M's FC-808, which is now known to be hazardous to human health:

> It may be desirable to add a water repellent coating to the baffle composite. The composite after formation can be readily subjected to a dip process and a suitable water-proof coating for the composite is a 3M fluoro-carbon water repellent designated as FC-808. Other suitable fluorocarbons may also be employed and, less preferred, because of the negative textural effects are the silicone water repellent treatments. The baffle composite itself may be attached to the other components of the napkin adhesively or by fusing them to the nonwo-

148. In 1992, Kimberly-Clark patented U.S. No. 5,149,576 for a layered fabric used in diapers to keep liquid from leaking through. The invention worked by building up different nonwoven layers, one of which was treated to resist urine and other body fluids. To make that layer repel liquids, Kimberly-Clark specified the use of what they referred to as "Additive G" and "Additive H", which were "perfluoroalkyl urethane" polymer additives sold by 3M known then as L-8977 and L-8982, as well as several DuPont products. These fluorochemicals contained dangerous PFAS, such as PFOS, PFOA, and their precursors.

> Additive G
> This additive is a perfluoroalkyl urethane, L-8977, which is available from 3M Company, St. Paul, Minn. The material is a white powder having a melting point of 130°–138° C. No other information regarding the material is available.
>  Additive H
> This additive is similar to Additive G and is available from the same source as L-8982. No information regarding the material is available.

149. In 1993, Kimberly-Clark patented U.S. No. 5,178,931 for a *Three-Layer Nonwoven Laminiferous Structure* fabric where the middle layer was engineered to be alcohol-repellent. This was exactly the kind of breathable but protective barrier used in diapers to stop leaks while still allowing air to pass through. Once again, Kimberly-Clark identified several PFAS compounds,

33

including 3M's perfluoroalkyl urethane polymer additives L-8977 and L-8982, but also included FX-1801 as "Additive M" under the name L-10307, along with several DuPont products as the chemicals that provided the needed repellency.

**Additive A**

This additive is a perfluoroalkyl urethane, L-8977, which is available from 3M Company, St. Paul, Minnesota. The material is a white powder having a melting point of 130°–138° C. No other information regarding the material is available.

**Additive B**

This additive, identified by the manufacturer as L-8982, is similar to Additive A and is available from the same source. No information regarding the material is available.

**Additive C**

The additive, MPD-7901, available from DuPont (Wilmington, Del. 19898), is a 2-perfluoroalkylethyl acetate. It has a melting point of 23°–24° C. and negligible solubility in water.

**Additive D**

This additive is a 2-perfluoroalkylethyl hexanoate, available from DuPont as MPD-7902. It has a melting point of 30°–50° C. and negligible solubility in water.

**· Additive M**

This additive is a fluorochemical urethane derivative, L-10307, from 3M Company, St. Paul, Minn. The material is a white powder having a melting point of 130°–138° C. No other information regarding the material is available.

As already noted, the additive preferentially migrates to the surfaces of the melt-extruded microfibers of the second nonwoven web as they are formed. Thus, the additive imparts alcohol repellency to the surfaces of such microfibers.

The nonwoven laminiferous structure is pattern bonded by the application of heat and pressure. Preferably, such application of heat and pressure will be in the ranges of from about 120° C. to about 220° C. and from about 150 to about 1,000 pounds per linear inch (59–178 kg/cm), respectively. More preferably, a pattern having from about 10 to about 600 bonds/inch$^2$ (1–93 bonds/cm$^2$) covering from about 5 to about 30 percent

150. By 1996, Kimberly-Clark obtained Patent No. 5,482,765, which improved on earlier versions by making the liquid barrier part of the fibers themselves. That is, instead of bathing the fabric in chemicals after it was made, this invention required mixing fluorochemicals directly into the melted plastic before spinning it into fibers. This process made the barrier permanent and showed Kimberly-Clark's shift from topical treatments to internal melt additives developed in conjunction with 3M. The patent called for a fluorocarbon additive and identified 3M's FX-1801 (formerly L-10307) as the key chemical, stating, "[a] particularly well suited additive is **FX-1801, formerly called L-10307**, which is available from the 3M Company of St. Paul, Minn.":

34

The meltblown layer of the fabric of this invention contains a fluorocarbon chemical to impart low surface tension liquid repellency which may be any of those taught in U.S. Pat. No. 5,178,931, column 7, line 40 to column 8, line 60. A particularly well suited additive is FX-1801, formerly called L-10307, which is available from the 3M Company of St. Paul, Minn. This material is identified as Additive M in the above cited patent and as having a melting point of about 130° to 138° C. This material is added to the meltblown layers at an amount of about 0.1 to about 2.0 weight percent or more particularly between about 0.25 and 1.0 weight percent. As noted in the above patent, the fluorocarbon additive is an internal additive, as differentiated from a topically applied additive, and preferentially migrates to the surface of the meltblown fibers as they are formed.

151.    Now-public documents obtained by the Minnesota Attorney General in discovery in its lawsuit against 3M reveal that FC-808 and FX-1801, both purchased and used by Kimberly-Clark, were part of 3M's family of PFAS products, which, by 1999, 3M knew were causing devastating effects on the environment and public health and which were part of the joint 3M and EPA phaseout announced in 2000.

152.    Plaintiff's testing of Kimberly-Clark's Huggies disposable diapers found high levels of MeFOSE, EtFOSE, MeFOSA, confirming Kimberly-Clark's use of FC-808 and FX-1801 in its consumer products.

153.    By 2000, Kimberly-Clark knew that the PFAS Chemicals it had long used—including PFOS and PFOA supplied by 3M and DuPont—posed serious public health and environmental dangers. That year, 3M and the EPA jointly announced the phase-out of PFOS because of its persistence, bioaccumulation, and toxicity. As a major purchaser and user of these very chemicals, Kimberly-Clark was also likely informed directly of these dangers by 3M, as discussed above.

35

154.    In the years that followed, Kimberly-Clark's own patent filings confirmed its recognition of the environmental harm caused by PFAS, the regulatory pressure to eliminate them, and the importance of finding alternative, non-fluorinated methods of imparting liquid repellency. Yet, despite this knowledge, Kimberly-Clark took no steps to address the contamination its operations had already unleashed in New Milford. Instead, it allowed PFAS to continue migrating from the Kimberly-Clark Landfill into nearby wetlands and the Housatonic River.

155.    For example, in 2012, Kimberly-Clark filed for Patent WO 2012/085709 A1 for a splash-resistant facemask that directly addressed the use of fluorochemicals as repellency treatments being phased out **due to concerns of safety and environmental degradation:**

> While fluorocarbon treatments may increase the repellency of facemasks, there is concern regarding the safety of such treated materials. Many uses of fluorocarbons were phased out in the United States in the 1970s and 1980 due to concerns of safety and environmental degradation.

156.    Similarly, in 2013, Kimberly-Clark filed for what would ultimately be granted as US Patent No. 9,803,100 for an invention it named *Non-fluorinated water-based superhydrophobic surfaces*. In the filing, Kimberly-Clark explicitly acknowledges the environmental and health impetus to remove fluorochemicals. It notes that concerns over the "bio-persistence" of fluoropolymers and the bioaccumulation of their long-chain degradation byproducts have "provided an impetus for eliminating these chemicals." The patent warns that perfluorinated acids like PFOA can "break down" from such coatings and "have a documented ability to bioaccumulate" with potential adverse developmental effects. Citing the EPA's 2006 PFOA Stewardship Program, it observes a "shift in the manufacture and usage of fluoropolymers" to reduce PFOA-related risks and emphasizes that in products with prolonged human contact or destined for landfills, fluoropolymer use "must be minimized."

36

Also, such coatings usually contain fluoropolymers. A low-surface energy polymer (~20 mN/m) must be incorporated into the coating (a general requirement of any liquid repellent surface) which is conveniently achieved by utilizing fluoropolymers (e.g., fluoroacrylic copolymers, poly (tetrafluoroethylene), etc.). However, concerns over their bio-persistence have provided an impetus for eliminating these chemicals. The problems with the byproducts of fluoropolymer degradation, e.g. long-chain perfluorinated acids (PFAs), which have a documented ability to bioaccumulate, as well as the potential adverse effects PFA in maternal concentrations can have on human offspring, have led to a shift in the manufacture and usage of fluoropolymers. One common PFA of particular concern is perfluorooctanoic acid (PFOA). In 2006, the EPA introduced its PFOA (perfluorooctanoic acid) Stewardship Program and invited eight major fluoropolymer and telomer manufacturers to commit to eliminating precursor chemicals that can break down into PFOA; in one case, DuPont introduced so-called short-chain chemistry, whereby the length of per-fluorinated chains within polymers are kept below a threshold in order to avoid degradation into PFOA. In other applications, usage of fluoropolymers in products that come in sustained contact with the human body or in disposable items intended for landfilling after consumption must be minimized.

157.    In sum, Kimberly-Clark's patents, spanning more than four decades, prove Kimberly-Clark's deliberate and continuous use of PFAS products in its own manufacturing activities, including activities specific to Kimberly-Clark's diaper products made and sold under the Huggies line. Kimberly-Clark continued these practices well after being informed by 3M and the EPA of the harms caused by fluorinated products such as FC-808 and FX-1801 and other PFOS and PFOA-based products. As discussed below, Plaintiff's testing of Huggies and Kleenex products and the water runoff from the Kimberly-Clark Landfill confirm Kimberly-Clark's use of PFAS products and contamination of the environment with PFAS.

158.    While the Kimberly-Clark patents above primarily describe its use of fluorochemical technologies in the manufacture of disposable diapers and nonwoven absorbent

products, the laboratory results for Kimberly-Clark's Kleenex tissues demonstrate that Kimberly-Clark likewise employed PFAS in its tissue manufacturing. Given Kimberly-Clark's documented reliance on 3M-developed fluorochemical technologies, Kimberly-Clark likely relied on fluorochemical treatments 3M developed for paper and nonwoven products, such as Patent No. 4,426,466:

**United States Patent** [19]

Schwartz

[11]    4,426,466

[45]    Jan. 17, 1984

[54] PAPER TREATMENT COMPOSITIONS CONTAINING FLUOROCHEMICAL CARBOXYLIC ACID AND EPOXIDIC CATIONIC RESIN

[75] Inventor:    Craig A. Schwartz, Oakdale, Minn.

[73] Assignee:    Minnesota Mining and Manufacturing Company, St. Paul, Minn.

[21] Appl. No.: 386,631

[22] Filed:    Jun. 9, 1982

[51] Int. Cl.³ ................... C14C 9/00; D21H 3/02; D21H 3/58

[52] U.S. Cl. ................... 523/455; 162/164.2; 162/164.3; 428/537

[58] Field of Search ............. 523/455; 162/164.2, 162/164.3; 428/537

[56]    References Cited

U.S. PATENT DOCUMENTS

Encyclopedia of Chemical Technology, 3rd Ed., vol. 16, pp. 803–825 (1981).

Dumas, "An Overview of Cellulose Reactive Sizes," TAPPI conference preprint, Sizing Short Course, Chicago, Ill. (1981).

Bates, "Polyamide–Epichlorohydrin Wet-Strength Resin," TAPPI, The Journal of the Technical Association of the Pulp and Paper Industry, 52, 6, (Jun. 1969).

Davison, "The Sizing of Paper," TAPPI, The Journal of the Technical Association of the Pulp and Paper Industry, 58, 3, p. 45, (Mar. 1975).

Davis, et al., "A New Sizing Agent for Paper—Alkylketene Dimers," TAPPI, The Journal of the Technical Association of the Pulp and Paper Industry, 39, 1, pp. 21–23 (Jan. 1956).

Rengel and Young, "Internal Sizing of Paper and Paperboard," TAPPI monograph series number 33, pp. 170–189 (1971).

Colbert, "Fluorochemicals–Fluid Repellency for Non—Woven Substrates," TAPPI, The Journal of the Technical Association of the Pulp and Paper Industry, 59, 9, (Sep. 1976).

Banks, Ed., Organofluorine Chemicals and their Industri-

## III.    TESTING CONFIRMS KIMBERLY-CLARK'S PRODUCTS CONTAINS PFAS.

159.    Because Kimberly-Clark's New Milford Facility manufactured Huggies diapers and Kleenex tissues, Plaintiff obtained representative Huggies and Kleenex products and tested their PFAS content to confirm that Kimberly-Clark used PFAS in its manufacturing as it indicated it would in its patents.

160.    Plaintiff obtained unopened Huggies disposable diapers and submitted them to a certified laboratory to conduct PFAS testing. The results confirmed the presence of MeFOSEA, the PFOS precursor which, as discussed above, was the primary ingredient in FC-808, and FX-1801, the two 3M products Kimberly-Clark cited in multiple nonwoven diaper technology patents over the course of several decades. The results of this testing showed high levels of three PFOS precursors as expected:

## HUGGIES DIAPER PFAS TEST RESULTS

|  | MeFOSE (ng/g) | EtFOSE (ng/g) | MeFOSA (ng/g) | MeFOSE (ppt) | EtFOSE (ppt) | MeFOSA (ppt) |
|---|---|---|---|---|---|---|
| Huggies Diaper - Fluff | 23 | 6.2 | 1.4 | 23,000 | 6,200 | 1,400 |
| Huggies Diaper - Mid Barrier | 20 | 4.7 | 1.5 | 20,000 | 4,700 | 1,500 |

161. These results show that the levels of PFOS and PFOA in Kimberly-Clark's diapers and tissues are vastly higher than what EPA allows in drinking water. Product and sludge concentrations are measured in nanograms per gram (ng/g), or parts per billion (ppb), while water is measured in nanograms per liter (ng/L), or parts per trillion (ppt). Because 1 ppb equals 1,000 ppt, the PFAS found in a single diaper sample at 200 ng/g (200 ppb) is the same as 200,000 ppt—50,000 times higher than EPA's 4 ppt limit for drinking water.

162. The Huggies diaper testing detected three PFOS precursors in high concentrations: MeFOSE, EtFOSE, and MeFOSA. These compounds are known residuals of 3M's FC products, as 3M itself confirmed in internal documents:

The secondary reactions producing all of these derivatives are single or sequential batch processes that do not necessarily produce pure products. There may be varying amounts of fluorochemical residuals (unreacted or partially reacted starting materials or intermediates) that are carried forward to the final product. Examples of such residuals include PFOS, n-methyl and n-ethyl FOSA and N-MeFOSE and N-Et FOSE alcohols. Typically, where present, these residuals can be found at a concentration of 1-2% or less in final products and, in the aggregate, represent roughly 1-2% of total FC production volume. (FC residuals in 3M products have the potential to degrade or metabolize to PFOS.) In addition, during product use or disposal, the non-fluorochemical moieties added to the sulfonyl fluoride group of POSF can also be removed through a variety of degradation processes (chemical, environmental and metabolic). In such instances, the fluorochemical species which is ultimately produced as a result of such degradation will generally be PFOS as well.

163. The detection of these residuals in Kimberly-Clark's consumer products confirms Kimberly-Clark's use of 3M's FC-808 and FX-1801 polymers in diaper manufacturing consistent with Kimberly-Clark's patent filings discussed above.

39

164. Plaintiff also tested five different unopened, "vintage" Kimberly-Clark-manufactured Kleenex products acquired from eBay and submitted those products for certified laboratory testing. Each of the five products—which the lab refers to as "Kleenex Aqua," "Kleenex Pink," "Kleenex Holly Red/Green," "Kleenex Prints," and "Kleenex Cocktail Napkins"—tested positive for PFAS. The results for PFOS and PFOA, which are the same PFAS Chemicals found in excess in the Kimberly-Clark landfill runoff and wells and on Plaintiff's property, are summarized below:

| Product | PFOS (ng/g) | PFOA (ng/g) | PFOS (ppt) | PFOA (ppt) |
|---|---|---|---|---|
| Kleenex Aqua | 1.0 | 0.34 | 1,000 | 340 |
| Kleenex Pink | 2.1 | 0.38 | 2,100 | 380 |
| Kleenex Holly Red/Green | 3.4 | 0.60 | 3,400 | 600 |
| Kleenex Prints | 39 | 14 | 39,000 | 14,000 |
| Kleenex Cocktail Napkins | 98 | 100 | 98,000 | 100,000 |

165. These results confirm that Kimberly-Clark's Kleenex products contained the very same long-chain PFAS chemicals—PFOS and PFOA—that are now contaminating the landfill leachate, nearby wells, and Plaintiff's property. The testing demonstrates that Kimberly-Clark's consumer products themselves were a direct source of the PFAS pollution now emanating from the Kimberly-Clark Landfill.

**IV. WATER RUNOFF FROM THE KIMBERLY-CLARK LANDFILL CONFIRMS THE PRESENCE OF PFAS IN KIMBERLY-CLARK WASTE AND HAS CONTAMINATED THE HOUSATONIC RIVER WITH PFAS.**

166. After Plaintiff discovered the drinking water well of 288 Kent Road was contaminated with PFOS and PFOA, Plaintiff performed two rounds of testing of water runoff from the Kimberly-Clark Landfill. The test results provide further confirmation that Kimberly-

Clark has used PFAS, including PFOS and PFOA specifically, in manufacturing diapers and tissue products at its New Milford Facility.

167.    As depicted in Figure 2 of this Complaint, a culvert shaded in blue carries surface water from the vicinity of the Kimberly-Clark Landfill directly toward the Housatonic River.

168.    In May 2024, immediately after discovering the contamination of 288 Kent Road's drinking water, Plaintiff collected a water sample immediately downstream of the culvert, after the water exited the culvert but before it entered the Housatonic River. Photographs of this sampling location are included below.



169.    Laboratory analysis of the May 2024 sample revealed high concentrations of PFOS and PFOA. These results are consistent with Kimberly-Clark's historic use of PFAS in its manufacturing operations and with the PFAS detected in Kimberly-Clark consumer products tested by Plaintiff. The results are set forth below.

**KIMBERLY-CLARK LANDFILL RUNOFF
CULVERT TEST RESULTS: MAY 2024**

| PFOS | 17.4 ng/l. |
|------|------------|
| PFOA | 5.91 ng/l |

170.    In August 2024, Plaintiff undertook a second round of sampling, this time mere feet from the Kimberly-Clark property line, immediately upstream of the culvert before the water entered it.

171.    Laboratory analysis of the August 2024 upstream sample showed even higher PFAS concentrations than those detected in May 2024. The results are set forth below.

**KIMBERLY-CLARK LANDFILL RUNOFF
TEST RESULTS: AUGUST 2024**

| PFOS | 31.2 ng/l. |
|------|------------|
| PFOA | 9.33 ng/l |

172.    The May and August 2025 test results are consistent with the Kimberly-Clark manufacturing practices it outlined in patents for decades and with contamination incidents elsewhere in the United States involving Kimberly-Clark tissue paper manufacturing. For example, Kimberly-Clark previously manufactured tissue paper at a facility located in Fullerton, California, which Kimberly-Clark closed in 2020. Upon the closing of the Fullerton, California Kimberly-Clark tissue paper plant in 2020, local officials discovered that a large drinking water well located adjacent to the Fullerton Kimberly-Clark site (which supplied over 75% of the drinking water supply for local water agencies) was contaminated with dangerous levels of PFAS Chemicals in similar concentrations to those found in the Kimberly-Clark Landfill runoff, requiring immediate

remediation to make the drinking water safe for human consumption. The PFOS and PFOA levels detected at the former Kimberly-Clark Fullerton tissue paper mill are similar to those detected in New Milford:

**FULLERTON, CALIFORNIA KIMBERLY-CLARK WELL 1A PFAS TEST RESULTS**

| PFOS | 19.2 ng/L |
|------|-----------|
| PFOA | 8.3 ng/L |

173.    The May and August 2024 sampling results further confirm that PFAS contamination is originating from the Kimberly-Clark Landfill and that water discharged through the culvert into the Housatonic River bears the chemical signature of Kimberly-Clark's PFAS use.

## V.    KIMBERLY-CLARK'S ONGOING POLLUTION OF CONNECTICUT WETLANDS AND WATERCOURSES VIOLATES THE IWWA, NEW MILFORD REGULATIONS, AND CEPA

174.    As shown in Figure 2 and others, above, the diversion streams, the main drainage stream, and the delineated wetlands on the Kimberly-Clark Landfill property—together with the culvert and the Housatonic River into which these waters discharge—are "watercourses" and "wetlands" within the meaning of the IWWA and the New Milford Inland Wetlands and Watercourses Regulations. Conn. Gen. Stat. § 22a-38(15)–(16); New Milford Inland Wetlands and Watercourses Regs. §§ 2.41 and 2.43.

175.    Under the IWWA and the New Milford Inland Wetlands and Watercourses Regulations, Kimberly-Clark's conduct—disposing of PFAS-contaminated short-fiber paper sludge in an unlined landfill, allowing stormwater and groundwater to contact that waste, and discharging PFAS-laden runoff into on-site wetlands and watercourses that flow to the Housatonic

43

River—constitutes a "regulated activity" affecting wetlands and watercourses. *See* Conn. Gen. Stat. §§ 22a-38(13), 22a-42a; New Milford Inland Wetlands and Watercourses Regs. § 2.29.

176.    The laboratory results from May and August 2024 establish "pollution" to the waters of the state: PFOS and PFOA were detected at health-protective exceedances downstream and immediately upstream of the culvert, confirming contamination of wetlands and watercourses. *See* Conn. Gen. Stat. § 22a-423 (defining "pollution"); New Milford IWW Regs. § 2.27 (same).

177.    Kimberly-Clark never obtained, and does not hold, any permit authorizing the discharge of PFOS or PFOA to wetlands or watercourses. Conducting a regulated activity that pollutes wetlands or watercourses without a valid permit violates the IWWA and the New Milford Inland Wetlands and Watercourses Regulations. Conn. Gen. Stat. §§ 22a-32(a), 22a-42a(c)(1); New Milford Inland Wetlands and Watercourses Regs. §§ 6.1 and 7.1.

178.    Each day that Kimberly-Clark allows PFAS-contaminated water to enter wetlands, watercourses, and/or the Housatonic River constitutes an ongoing violation subject to declaratory and injunctive relief under Conn. Gen. Stat. § 22a-44(b) and enforcement under municipal regulations adopted pursuant to the IWWA.

179.    The IWWA vests primary administration and enforcement in the local inland wetlands agency. Conn. Gen. Stat. § 22a-42. In New Milford, the New Milford IWC has a non-discretionary duty to investigate credible allegations, exercise jurisdiction, and enforce the Act. *Id.* § 22a-44.

180.    Plaintiff provided written notice to the New Milford IWC of Kimberly-Clark's PFAS discharges and culvert outfall contamination. Despite that notice, the Commission declined to investigate or enforce, citing staffing or resource constraints—reasons not recognized by the IWWA as a lawful basis to refuse to act. As a result, Kimberly-Clark continues to engage in

44

regulated activities without a permit in violation of the IWWA and New Milford Inland Wetlands and Watercourses Regulations.

181.    Independently of the IWWA and New Milford Regulations violations, Kimberly-Clark's conduct constitutes "unreasonable pollution, impairment or destruction" of Connecticut's natural resources in violation of CEPA. Conn. Gen. Stat. § 22a-16.

182.    In determining whether conduct constitutes "unreasonable pollution" under CEPA, courts balance the environmental harm against any claimed social or economic benefit, with the burden on the party causing the pollution to demonstrate that its conduct is justified. As detailed herein, PFOS and PFOA are persistent, bioaccumulative toxic contaminants that contaminate, *inter alia,* surface water, sediments, and groundwater. Discharging them into Connecticut wetlands, watercourses, groundwater, and the Housatonic River degrades public waters, wildlife habitat, and drinking-water sources by rendering those waters unsafe for human consumption, recreation, and ecological use, triggering CEPA's protection of the public trust in those resources. *See* Conn. Gen. Stat. §§ 22a-16, 22a-1, 22a-20.

183.    Under the balancing factors in Conn. Gen. Stat. § 22a-17, no valid social or economic justification outweighs the harm caused by these PFOS and PFOA discharges. Kimberly-Clark cannot justify the adverse human and environmental impacts of its PFAS discharges: there is no social or economic necessity to pollute, practicable alternatives exist (including containment and treatment), and the magnitude, duration, and irreversibility of PFAS harms outweigh any asserted utility. Given the known harms of PFAS to the environment and humans, Kimberly-Clark's conduct is inconsistent with reasonable requirements of public health, safety, and welfare.

184. Kimberly-Clark's permit-less regulated activity that pollutes wetlands and watercourses is per se unlawful under the IWWA; that same conduct, by contaminating public trust resources with long-lived toxicants, is "unreasonable pollution" under CEPA.

185. Accordingly, Plaintiff is entitled to: (a) declarations that Kimberly-Clark is engaging in regulated activities without a valid IWWA permit and is causing unreasonable pollution under CEPA; (b) an injunction prohibiting further PFAS discharges and requiring investigation, remediation, containment, and monitoring sufficient to abate the pollution; and (c) orders compelling the Town of New Milford and the New Milford IWC to administer and enforce the IWWA with respect to the violations alleged herein. *See* Conn. Gen. Stat. §§ 22a-44(b), 22a-18.

## CAUSES OF ACTION

**FIRST COUNT:      CONNECTICUT INLAND WETLAND AND WATERCOURSES ACT, CONN. GEN. STAT. §§ 22a-44(b)**

**(Against All Defendants)**

186. Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

187. Section 22a-44(b) of the IWWA, Conn. Gen. Stat. § 22a-36 *et seq.*, provides that if any person commits, assists, or takes part in any violation of any provision of the IWWA, to include ordinances and regulations promulgated by municipalities pursuant to a grant of authority under the IWWA, a violation of the IWWA has occurred.

188. Plaintiff is therefore personally and classically aggrieved by the PFAS contamination from the Kimberly-Clark Landfill because it has contaminated her well water with dangerous levels of PFOS and PFOA contaminants above the EPA action levels of 4.0 ng/l.

46

189.    Plaintiff is also personally and classically aggrieved by the PFAS contamination from the Kimberly-Clark Landfill because it has contaminated the Housatonic River with dangerous levels of PFOS and PFOA pollution.  The Housatonic River runs along and abuts the eastern edge of 288 Kent Road, the property where she resides just downstream from where the contamination from the Kimberly-Clark Landfill is dumped into the Housatonic River.

190.    Plaintiff is thus entitled to bring an action for declaratory and equitable relief against Defendants in connection with such violations under Conn. Gen. Stat. § 22a-44(b).

191.    Kimberly-Clark's actions and operations described herein constitute regulated activities under Conn. Gen. Stat. § 22a-38(13) and Section 2.29 of the New Milford Inland Wetlands and Watercourses Regulations.

192.    Kimberly-Clark engaged in the actions and operations described herein without seeking or obtaining a permit from the Town of New Milford or the New Milford IWC.

193.    Kimberly-Clark has engaged in and continues to engage in regulated activities without a permit in violation of Conn. Gen. Stats. §§ 22a-32(a) and 22a-42a(c)(1), as well as Sections 6 (6.1) and 7 (7.1) of the New Milford Inland Wetlands and Watercourses Regulations.

194.    Plaintiff is therefore entitled to declaratory and injunctive relief against Kimberly-Clark, including: (a) a judgment declaring that Kimberly-Clark has engaged in, and is currently engaging in, regulated activities without a permit in violation of the IWWA and the Town of New Milford Inland Wetlands and Watercourses Regulations, and (b) an order enjoining Kimberly-Clark from continuing to engage in regulated activities without a permit in violation of the IWWA and the Town of Milford Inland Wetlands and Watercourses Regulations.

195.    Despite receiving a formal complaint from Plaintiff on February 18, 2025, the Town of New Milford and the New Milford IWC have refused to investigate or exercise jurisdiction over Kimberly-Clark's activities at the Kimberly-Clark Landfill.

196.    The Town of New Milford and the New Milford IWC have failed to fulfill their statutory obligation under Conn. Gen. Stat. §§ 22a-42 and 22a-38(13); they are required to regulate activities that impact inland wetlands and watercourses within their boundaries, including the pollution of wetlands and watercourses. This failure includes their decision not to enforce Sections 6 (6.1) and 7 (7.1) of the New Milford Inland Wetlands and Watercourses Regulations as to Kimberly-Clark.

197.    Plaintiff is therefore entitled to declaratory and injunctive relief against the Town of New Milford and the New Milford IWC, including: (a) a judgment declaring that these defendants have violated the IWWA by refusing to investigate or exercise jurisdiction over Kimberly-Clark's regulated activities, and (b) an order requiring these defendants to enforce the IWWA and the Town of Milford Inland Wetland Regulations against Kimberly-Clark with respect to the regulated activities.

198.    Plaintiff is entitled to attorney's fees and costs from Defendants pursuant to Conn. Gen. Stat. § 22a-44(b).

**SECOND COUNT:   CONNECTICUT ENVIRONMENTAL PROTECTION ACT, CONN. GEN. STAT. § 22a-16 (Unreasonable Pollution)**

**(Against Defendant Kimberly-Clark)**

199.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

200.    Each of Kimberly-Clark's actions in arranging for PFAS to be released at the Kimberly-Clark Landfill and in failing to remediate those releases violates Conn. Gen. Stat. § 22a-

48

16 in that the actions have resulted in "unreasonable pollution, impairment or destruction" of the natural resources of the State of Connecticut.

201.    The soil, groundwater, and surface water at, under, and around the Kimberly-Clark Landfill and Plaintiff's property are the natural resources of the State of Connecticut.

202.    Kimberly-Clark's alteration and pollution of the soil, groundwater, and surface water at, under, and around the Kimberly-Clark Landfill and Plaintiff's property constituted and constitutes unreasonable pollution insofar as Kimberly-Clark violated and continues to violate the IWWA and the New Milford Inland Wetland Regulations by not seeking or obtaining permits to conduct such regulated activities.

203.    Kimberly-Clark's alteration and pollution of the soil, groundwater, and surface water at, under, and around the Kimberly-Clark Landfill and Plaintiff's property constituted and constitutes unreasonable pollution insofar as such regulated activities have contaminated and continue to contaminate the State's water and other natural resources with dangerously high levels of PFAS Chemicals, which are harmful to the environment, plants, animals, animal and aquatic ecosystems, and human beings.

204.    Conn. Gen. Stat. § 22a-16 aims to protect "the public trust in the air, water and other natural resources" of the State of Connecticut. For the reasons cited herein, Plaintiff is classically and statutorily aggrieved and therefore is entitled by statute to bring an action for declaratory and equitable relief against Kimberly-Clark in connection with its unlawful activities, which have resulted and continue to result in the contamination of natural resources in the New Milford area.

205.    Plaintiff is therefore entitled to declaratory and equitable relief against Kimberly-Clark, including: (a) a judgment declaring that Kimberly-Clark's actions and operations have caused, or are likely to cause, severe and irreparable harm to the natural resources of the state,

49

including the Housatonic River and the surrounding wetlands and watercourses, and (b) an injunction against Kimberly-Clark imposing conditions necessary to protect the public trust in the air, water, and other natural resources of the state from unreasonable pollution, impairment, or destruction, including but not limited to an order requiring Kimberly-Clark to perform investigations, removal, and/or remediation of the conditions and pollution it has caused.

206.    Plaintiff is entitled to attorney's fees and costs from Kimberly-Clark pursuant to Conn. Gen. Stat. § 22a-18(e).

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff claims the following relief:

1.    A judgment declaring that Kimberly-Clark has engaged in, and is currently engaging in, regulated activities without a permit in violation of the IWWA and the Town of New Milford Inland Wetlands and Watercourses Regulations.

2.    A judgment declaring that the Town of New Milford and the New Milford IWC have violated the IWWA by refusing to investigate or exercise jurisdiction over Kimberly-Clark's regulated activities.

3.    A judgment declaring that Kimberly-Clark's actions and operations have caused, or are likely to cause, severe and irreparable harm to the natural resources of the state, including the Housatonic River and the surrounding wetlands and watercourses.

4.    An order enjoining Kimberly-Clark from continuing to engage in regulated activities without a permit in violation of the IWWA and the Town of New Milford Inland Wetlands and Watercourses Regulations.

5.    An order requiring the Town of New Milford and the New Milford IWC to enforce the IWWA and the Town of Milford Inland Wetlands and Watercourses Regulations against Kimberly-Clark with respect to the regulated activities.

6.    An order restraining Kimberly-Clark from any continuing violation of the provisions of the Connecticut Environmental Protection Act, C.G.S. § 22a-16.

7.    An injunction against Kimberly-Clark imposing conditions necessary to protect the public trust in the air, water, and other natural resources of the state from unreasonable pollution, impairment, or destruction.

8.    An order requiring Kimberly-Clark to perform investigations, removal, and/or remediation of the conditions and pollution it has caused.

9.    Attorney's fees and costs pursuant to Conn. Gen. Stat. § 22a-44(b) and Conn. Gen. Stat. § 22a-18(e).

10.   Such other relief as the Court deems appropriate.

PLAINTIFF MINAH McBREAIRTY,

BY:   /s/ Ian W. Sloss
      Ian W. Sloss, Juris No. 434800
      Johnathan Seredynski, Juris No. 439263
      Krystyna Gancoss, Juris No. 438981
      Kate Sayed, Juris No. 445371
      SILVER GOLUB & TEITELL LLP
      ONE LANDMARK SQUARE, FLOOR 15
      STAMFORD, CONNECTICUT 06901
      Tel. (203) 325-4491
      isloss@sgtlaw.com
      jseredynski@sgtlaw.com
      kgancoss@sgtlaw.com
      ksayed@sgtlaw.com

ATTEST:

BRIAN R. WRIGHT
STATE MARSHAL
HARTFORD COUNTY

51

PLEASE ENTER THE APPEARANCE OF:

SILVER GOLUB & TEITELL LLP
ONE LANDMARK SQUARE, 15th FL.
STAMFORD, CT 06901
(203) 325-4491
JURIS NO. 058005

FOR THE PLAINTIFF

ATTEST:

BRIAN P. WRIGHT
STATE MARSHAL
HARTFORD COUNTY

52